# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **RANDOLPH PENDARVIS AND TAMMY PENDARVIS** | **CIVIL ACTION NO. 06-772-DLD** |
| **VERSUS** | |
| **AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA** | **CONSENT CASE** |

## OPINION

This consent property damage and bad faith insurance settlement proceeds case comes before this court for decision following a bench trial on February 26, 2008.  The plaintiffs, Randolph and Tammy Pendarvis, claim that defendant, American Bankers Insurance Company of Florida, failed to timely pay insurance policy proceeds due as a result of damages sustained to their mobile home by Hurricane Katrina, which refusal  only served to increase the property damages and further caused Tammy Pendarvis to suffer mental anguish.

The issues presented include, *inter alia:* (1) whether the defendant misrepresented pertinent facts or insurance policy provisions relating to coverages at issue in violation of La.R.S. 22:1220(B)(1); (2) whether defendant failed to pay the amount of the claim within 60 days of receiving a satisfactory proof of loss from the plaintiffs in violation of La.R.S. 22:1220(B)(5); (3) the amount due under the terms of the insurance policy for the damages to the plaintiffs' mobile home; and (4) whether plaintiffs are entitled to actual damages, penalties, or attorney's fees under La. R.S. 22:658 and/or 22:1220(C).

## Findings of Fact

Plaintiffs Randolph and Tammy Pendarvis are the co-owners of a mobile home located at 45342 Myers Estate Road, Prairieville, Louisiana.  Defendant issued insurance policy numbered MHA333497100 covering the mobile home, which names Randolph Pendarvis as the "named insured" and Tammy Pendarvis as an "additional insured."  This policy, with effective dates of  December 11, 2004, to December 11, 2005, provides coverage for certain damages arising from Hurricane Katrina, which occurred on August 29, 2005.

Plaintiffs moved into the mobile home in 1999.  In 2004, plaintiffs discovered a leak that they believed was caused by a vent in the roof directly above the master bathroom, and they saw some spots over the lighting in the master bathroom that they believed might be mold, so they called defendant to inspect the mobile home.[1]  On August 31, 2004, defendant inspected the areas pointed out by the plaintiffs and took photographs. Exhibit 29. These photographs do not show any missing or broken shingles.  Plaintiffs then completed a mold questionnaire in which they informed defendant that they attempted repairs to the roof, but were unable to find the source of the leak;  that they applied mildewcide to the affected areas; and that Tammy Pendarvis was allergic to mold.  Exhibit 34.  Defendant's adjustor completed a report in which he stated that "it was very difficult to observe or document any mold in the areas where the insured was reporting damages."  Id.  Additionally, the adjustor's report stated that he "did not find a storm created opening."

---

[1]   Tammy Pendarvis testified that she called defendant at the first sign of what she thought might be mold because of her oversensitivity and allergy to mold.  Tammy Pendarvis was tested for allergies in 2000 and 2002.  Exhibit 19.

 The report does not indicate that the adjustor identified a leak in the roof.  The adjustor simply noted that plaintiffs made repairs to the roof, and defendant tendered $142.00 in payment of the 2004 claim.  Id.  Defendant did not explain the basis for the $142.00 payment.

Randolph Pendarvis made repairs to the leak in the roof with roofing tar, focusing on the vent over the bathroom,  which he though might have been the cause of the leak.  While making the repairs, he noticed that something seemed wrong with the roofing shingles.  Concerned about the way the roof was shingled and what they thought had been a leak, plaintiffs asked Leroy Young with L&R Builders, LLC to inspect the roof.[2]   Young determined that the shingles were installed improperly by the manufacturer in that they were secured by two staples in the center of each shingle rather than by four tacks on the end of each shingle, which allowed the shingles to curl upward.   Young estimated that it would cost $9,870.00 to repair (basically to replace) plaintiffs' entire roof because the shingles were brittle and loose and the roof had some soft spots.[3] Exhibit 33.

Plaintiffs then made another claim with defendant based on the improperly installed shingles.  On February 25, 2005, defendant's adjustor inspected the shingles and once again took photographs.  Exhibit 32.  Although no shingles were missing, the adjustor's photographs show that the shingles, just as Leroy Young had said,  were secured by two

---

[2] Leroy Young has been a residential contractor with L&R Builders, LLC since 1990.  He builds and remodels homes.

[3] Young testified that his $9,870.00 estimate was to repair the plaintiffs' roof due to the way the roof was manufactured.  The estimate included the cost of repairing the shingles on the roof, any sheeting that may have gotten wet underneath the shingles, and  additional amounts for unexpected repairs and any damages he might sustain during the repairs.  Young testified that his estimate was reasonable, even though a precise figure could not be determined until the shingles were removed so that he could further inspect the condition of the sheeting.

staples in the center of each shingle rather than by four tacks on the end of each shingle. These photographs also show what appears to be some water damage behind one of the fascia boards on the front of the mobile home. Id.

After his inspection, defendant's adjustor concluded that the leak previously reported was caused by the improper installation of the shingles by the manufacturer, which was not a covered loss; thus plaintiffs were not entitled to any payment under the policy.  Id. Plaintiffs made their own repairs by tarring the roof, which prevented any further leaking in the roof. Exhibit 17(35) and (25).

On August 29, 2005, plaintiffs' mobile home was damaged by Hurricane Katrina. Plaintiffs left their mobile home dry and in good condition at 8:00 p.m. on August 28, 2005, and were not at home when the storm hit.   They returned to their home around 10:00 a.m. the day of the storm to find that the mobile home was not level and that shingles and fascia board had been blown off of the home.  Plaintiffs entered the home to find water coming through all of the windows and wet walls and carpet in almost every room.  The utility room had leaves in the vent over the dryer;  the kitchen had water running out of the cabinets, the microwave, and the stove;  there was water dripping on the floor and standing on top of cabinets. The dining room had water damage inside the window sills;  the fascia board was receding from the ceiling;  the crown molding was coming off of the archway;  the living room had water dripping from the ceiling;  the walls and ceiling were bubbling;  the master bedroom had water in the window sills;  the master bathroom had water pouring through the ceiling;  the vent was yellow from water;  and the track lights were popping.   Plaintiffs did not have power for three days, and the electrical panel on the mobile home had to be changed for fear that it would cause a fire. None of these conditions existed prior to

Hurricane Katrina.   Plaintiffs took photographs within a week of Hurricane Katrina which reflect the water damage and mold inside the mobile home.  Exhibits 17(1)-(48).

The evidence is unclear as to exactly when plaintiffs reported their claim after Hurricane Katrina.  Tammy Pendarvis testified that she called defendant within a week of the storm to give notice of the damage to her home.   Defendant's "loss notice" shows that it received notice of the claim on September 20, 2005. Exhibits 1 and 13.   Defendant sent one of its catastrophe adjustors to inspect the damage on October 17, 2005.[4]  During the inspection, Tammy Pendarvis walked defendant's adjustor through each room of the house and pointed out the mold and water damage listed above.

Defendant quickly determined that the damage to the home was caused by Hurricane Katrina, and that there was "damage to the roof, skirting, the home was not level, and . . .  roofing shingles were blown up by high winds and debris." Exhibit 7.  Defendant's estimate allowed for repair of certain items in plaintiffs' mobile home, identified in the explanation of benefits, which was forwarded to plaintiffs.  Defendant's witness,  Darron McKnight,  further testified that the adjustor who handled plaintiffs' claim in October 2005 was neither involved with nor aware of plaintiffs' prior claims in 2004, even though he had conducted a claim search in defendant's computer system. Exhibit 7.  McKnight explained that nothing was deducted for the prior claim in the Katrina claim, not even for roofing repairs, which was an allowed item of damages.

---

[4] Obviously, by the time defendant inspected the damage to plaintiffs' mobile home on October 17, 2005, almost seven weeks after Hurricane Katrina, the standing water in the mobile home would have been cleaned up or would have dried on its own.

Defendant estimated the total repair/replacement value of the damaged items was $6,345.22, less depreciation in the amount of $1,140.39, less the deductible $500.00, totaling $4,704.83. Exhibit 7. On October 21, 2005, defendant issued a check to plaintiffs in the amount of $4,704.83 with a cover letter which states that "[t]his correspondence is written without prejudice to the parties herein involved and is not meant to be nor should it be considered to be a waiver of any of your rights or ours." Exhibit 5. Darron McKnight testified that plaintiffs would not have waived any of their rights by accepting the money and that all checks issued in connection with plaintiffs' claim were unconditional tenders of payment. The plaintiffs, however, have never negotiated the check for fearing of impairing their rights under the policy.

Since plaintiffs thought that the tender made by defendant was unreasonable and did not take into consideration several rooms in the house that sustained damage, they did not believe that the $4,704.83  tendered would allow them to repair the damage to their mobile home. On December 23, 2005, plaintiffs informed defendant that their home could not be repaired for the amount originally tendered in late October. Tammy Pendarvis testified that defendant responded by telling her that the insurer needed an estimate of repairs from a contractor in order to reevaluate its estimate.

In the meantime, Tammy Pendarvis began suffering with her allergies due to the prolonged exposure to the mold and mildew in the mobile home. She testified that after the first inspection by defendant, the mold, mildew, and visible water damage in plaintiffs' mobile home grew worse. She explained that she cleaned the mold at least once a month until she got sick, but it kept coming back.  Exhibits 17(55)-(105). She was treated by Dr. Stanley Peters on November 11, 2005, for hoarseness, sore throat, congestion, headache,

and cough. Exhibit 19. On February 12, 2006, she was treated at the Emergency Room at the Our Lady of the Lake Regional Medical Center in Baton Rouge, Louisiana, for a cough, fever, throat and chest pain, nausea, and vomiting.  Id.  Thereafter, she was treated on February 13, 20, and 27, 2006, by Dr. Peters for similar symptoms, identified as sinusitis, bronchitis, and congestion. Id.   On February 22, 2006,  she told defendant that she was allergic to mold and that FEMA had inspected her home, found mold, and advised that the home had to be completely gutted before anyone could live there.[5]  Exhibit 13.  Tammy Pendarvis also informed defendant that she, her husband, her two sons, and her granddaughter were moving into a FEMA trailer because their mobile home was uninhabitable.  She testified that her symptoms improved once she moved into the FEMA trailer.

On March 22, 2006, plaintiffs contacted  Leroy Young and asked him to inspect their home and to prepare an estimate of the cost to repair the damage.   Young concluded that the entire mobile home needed to be "gutted" and estimated the cost to repair the mobile home to be $71,500.00. Exhibit 18.  The evidence is unclear as to when plaintiffs originally forwarded  Young's estimate to defendant.   It is clear, however, that  Young's original estimate did not include detailed information supporting his estimate.   Young, however, ultimately provided a more detailed estimate and forwarded this detailed estimate to the defendant.  It appears that the second, more detailed estimate was faxed by Tammy Pendarvis on June 7, 2006.  Exhibit 12.   On June 23, 2006, in response to  Young's

---

[5] Tammy Pendarvis also testified that she had problems with allergies for years.  She testified that she is affected by pollen, ragweed, dog dander, and mold.  Tammy Pendarvis testified that when she got sick after Katrina, the only thing she was exposed to was mold, which caused her runny nose, headaches, cough, and congestion.

estimate,  defendant acknowledged that the loss would have to be reinspected in light of this new and detailed estimate of the cost of repairs. Exhibit 13.

Defendant then reassigned the claim to an independent adjusting company, The Fountain Group, LLC, for reinspection.  An adjustor with the Fountain Group, LLC, performed the second inspection of plaintiffs' mobile home and took photographs of the damage on June 29, 2006. Exhibit 8.  The Fountain Group  adjustor concluded in his July 13, 2006, report that "[t]he amount paid was not enough and a few items were damaged and not included in the original estimate."  Exhibit 8.  The adjustor also noted that the original adjustor "did not allow enough payment to make roofing repairs."  Id.  The second adjustor made additional allowances and recommended a supplemental payment in the amount of $4,377.20, less $593.51 depreciation, for a total payment of $3,783.69. Id. The additional allowances were for roof repairs, wall repair and insulation, and a few other repairs.  Id.  On August 2, 2006, defendant issued a check to the plaintiffs' lienholder, GreenTree Servicing, LLC, in the amount of $3,783.69, but the lienholder never received the check. Exhibit 6.

On August 14, 2006, plaintiffs returned the original insurance check in the amount of $4,704.83 to the defendant, stating as before, that the amounts tendered by the defendant were insufficient to make the necessary repairs to their mobile home.  Exhibit 13.  Although defendant believed  Young's estimate to be too high, on August 16, 2006, defendant developed a plan of action to have a local adjustor review the estimate provided by plaintiffs' contractor, to have a local contractor provide another estimate, and then hopefully to agree to a price for the repairs in an effort to settle the claim.  This plan was never put into action, according to defendant,  because plaintiffs notified defendant on

-8-

August 25, 2006, that they had contacted an attorney, and on August 28, 2006, they filed suit. Id. Defendant had also intended for the local adjustor to contact a local dealer to get a value for a trade-in. Id.  Defendant, however, did not introduce any evidence at trial that it ever made any effort to meet with a local contractor, to obtain a local estimate, or to obtain a trade-in value after plaintiffs filed suit.

At the end of 2006, plaintiffs moved back into their mobile home because the FEMA trailer was too confining.  Plaintiffs testified that living in the FEMA trailer was inconvenient and resulted in fighting between the family members.  Tammy Pendarvis testified that she felt better living in her more spacious mobile home with the mold and taking her antihistamines than living in the small FEMA trailer with her entire family.

On October 8, 2007, after plaintiffs filed suit, defendant had a third adjustor, Darron McKnight, reinspect the claims filed in 2004 and 2005.   McKnight testified that defendant uses the Simsol computer based program in adjusting its claims, which bases its estimates on pricing data from the Craftsman Handbook.  After inspecting plaintiffs' mobile home on October 8, 2007,  Mcknight estimated that the damages to plaintiffs' mobile home totaled $17,104.20, less depreciation $3,237.07, less deductible, $500.00, totaling $13,367.13. Exhibit 37.  He nevertheless testified that he did not recommend payment of this claim because of his concerns regarding the prior claim made by plaintiffs in 2004 for roof damage, and because of the plaintiffs' failure to protect their property.

There were several differences in the estimate made by  McKnight and the previous estimates made in connection with the inspections made after Hurricane Katrina.   For example,   McKnight's estimate includes repairs necessary for  several additional rooms not identified in the previous estimates –  the master toilet, master bedroom, dining room,

bedroom 2, bedroom 1 (identified in the July 13, 2006 estimate), and bedroom 1 closet. Exhibit 37. His estimate also includes additional repairs that were not allowed in either the October 21, 2005, or the July 13, 2006, estimates. For example, rather than shampooing and deodorizing carpet, McKnight recommended that the carpet be removed and replaced and allowed for a new carpet pad; he recommended that the walls and floors of the house be treated with mildewcide; he recommended that the sheetrock be replaced in many areas, and that the wall insulation be removed and replaced. Exhibits 7 and 37.

Mcknight concluded in his October 8, 2007, report that the damage was worse two years after Hurricane Katrina, which he believed indicated an active leak. Exhibit 37. He opined that the active leak related back to the June 2004 claim, where the plaintiffs' reported water/mold/roof damage. He further noted that a review of the photographs taken in connection with June 2004, claim did not reveal missing shingles, which would have led to wind driven rain, but rather, the leak was attributable to improper shingle installation by the manufacturer in that the roofing staples were not installed in the correct place on the shingles. He concluded that because the roof had not been replaced since 2004, the roof had been leaking since 2004, which caused the damage in the mobile home to worsen. Id.

As of the date of trial, plaintiffs had not replaced the roof on the mobile home. Additionally, plaintiffs placed a tarp on the roof only after the second adjustor inspected the mobile home in July 2006. When questioned about his obligation to protect the mobile home from further damage and the temporary protection afforded by a tarp, Randolph Pendarvis testified that the language in the insurance policy allowed him to make only "necessary emergency repairs." Additionally, he testified that he did not replace the roof on the mobile home because defendant's tender was insufficient; therefore, he made only

the emergency repairs that he could afford by tarring the roof to prevent future leaks. Plaintiff has tarred the roof two or three times since Hurricane Katrina.

McKnight testified that because defendant did not have a local contractor provide an estimate of what it would cost to repair plaintiffs' mobile home, defendant does not know what an actual contractor would charge to do the work and, therefore, could not say that Leroy Young's estimate was unreasonable.    McKnight also testified that defendant is willing to reissue both of the insurance checks previously tendered to the plaintiffs in the amounts of $4,704.83 and $3,783.69, totaling $8,488.52.

### Conclusions of Law

The parties do not dispute that the plaintiffs enjoy coverage under the policy for property damage to their home caused by Hurricane Katrina.  Their dispute instead centers on the extent and value of that damage, and whether the defendant breached its duty of good faith and fair dealing in adjusting the loss.  Since both sides agree that some amount is due under the policy, the court begins with what is usually the end of the analysis; that is, whether or not the insurer breached its duties of good faith and fair dealing.

*Duty of Insured Under La. R.S. 22:658 and 22:1220.*

Pursuant to Louisiana law, an insurer has a duty of good faith to settle claims with its insured.  La. R.S. 22:658 and 22:1220(A).[6]  An insurer has "an affirmative duty to adjust

---

[6] Plaintiffs seek damages, penalties, and attorney's fees for defendant's bad faith failure to pay within the statutory period.  Both La. R.S. 22:658 and 22:1220 require an insurer to perform a reasonable investigation of a claim and make a good faith duty to settle the claim within 30 (La. R.S. 22:658) or 60 (22:1220) days.  If an insurer's failure to pay is found to be arbitrary and capricious under either statute, it may be liable for damages, penalties and/or attorney's fees.  The penalties and attorney's fees under La. R.S. 22:658 are mandatory, and the damages and penalties under La. R.S. 22:1220 are discretionary.  The Louisiana Supreme Court in *Calogero v. Safeway Ins. Co.*, 753 So.2d 170, 174 (La. 1/19/00), held that where La. R.S. 22:1220 provides the greater penalty, La. R.S. 22:1220 supercedes La. R.S. 22:658 such that the plaintiffs cannot recover penalties under *both* statutes.  Thus, if an insurer is found to have breached La. R.S.

claims fairly and promptly and to make a reasonable effort to settle claims with the insured.

Id.   If an insurer breaches its duty of good faith and fair dealing, it "shall be liable for any

damages sustained as a result of the breach." Id.  Section 22:1220(B) defines the specific

acts which constitute a breach of the duty of good faith and fair dealing, and provides in

pertinent part:

> Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection
>
> A:
>
> (1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
>
> * * *
>
> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>
> La. R.S. 22:1220(B).
>
> Only La. R.S. 22: 1220(B)(1) and (5) are applicable to the matter before the court.

### _Misrepresentations Under the Policy_

A misrepresentation can occur when an insurer either makes untrue statements to

an insured concerning pertinent facts or fails to divulge pertinent facts to the insured.

_McGee v. Omni Ins. Co._, 840 So.2d 1248, 1256 (La. App. 3rd Cir. 2003).  Plaintiffs believe

the statement on the October 21, 2005, insurance payment which states, "[t]his

---

22:658 by failing to pay a claim within thirty (30) days of receiving satisfactory proof of loss, it can be held liable for both the greater of the penalties under either La. R.S. 22:1220 or 22:658, and the mandatory attorney's fees under La. R.S. 22:658.
    Plaintiffs argued in their opposition to defendant's motion for partial summary judgment that they were seeking damages pursuant to La. R.S. 22:1220 (rec. doc. 28).  Plaintiffs also argued specific violations of La. R.S. 22:1220(B)(1) and (B)(5) in their post-trial brief. Thus, the Court analyzes plaintiffs' arguments in light of La. R.S. 22:1220.

correspondence is written without prejudice to the parties herein involved and is not meant to be nor should it be considered to be a waiver of any of your rights or ours," indicates that the insurance check was in *final payment* of their claim under the policy.   Exhibit 5[7] Plaintiffs did not offer any additional evidence on this issue.

Defendant testified at trial that all payments made under they policy were unconditional tenders.   After defendant made the original payment on October 21, 2005, it reinspected the loss and approved a second payment on August 2, 2005, which further shows that defendant's payments in satisfaction of plaintiffs' claim were unconditional and that defendant was trying to work with plaintiffs to resolve the claim.   There is no evidence in the record that defendant tried to mislead plaintiffs as to the provisions or coverages afforded by the policy at any time.

Plaintiffs also complain that defendant erroneously subtracted depreciation from the cost of repair and that the policy does not contain a provision allowing for such a deduction. The defendant, however, did not contend that such a provision was in the policy, but rather argued that standard insurance industry practice and the regulations governing the payment of claims provide the guidance for the computation of amounts due for cost of repair and actual cash value.   The defendant did not make untrue statements or fail to divulge pertinent facts; it relied on the Louisianan Department of Insurance's definition of "actual cash value" as "the amount needed to repair or replace damaged property, minus depreciation." Louisiana Department of Insurance Bulletin 06-06, p. 3.   Defendant, not surprisingly, interpreted this provision in its favor; the plaintiff disagrees.   Such a dispute

---

[7] The same statement appears on the August 2, 2006, insurance payment, but that payment was never received by either the plaintiffs or their lienholder.

over the correct interpretation of a provision is not a misrepresentation or a breach of good faith and fair dealing.

Moreover, plaintiffs did not raise the issue of misrepresentation in either their original petition or amended petition.  The first time both the Court and the defendant became aware that plaintiffs intended to advance allegations that defendant misrepresented policy provisions regarding depreciation was at trial, and defendant's counsel raised an objection to plaintiffs' new arguments at trial.  Thus, even if the Court were to have found that defendant "misrepresented" a policy provision, plaintiffs still could not prevail because they did not timely put defendant on notice of their claim.

Plaintiffs therefore have failed to sustain their burden of proving that defendant misrepresented facts under the policy in violation of La. R.S. 22:1220.

_Failure to Pay_

Pursuant to Louisiana law, an insurer is required to pay an insured's claim within thirty days under La. R.S. 22:658 or sixty days under La. R.S. 22:1220(B)(5) after satisfactory proof of loss.  If an insurer's failure to pay is found to be arbitrary, capricious, and without probable cause, it shall be liable for damages as a result of the breach, and may be liable for penalties and attorney's fees.[8]  The insured has the burden of proving the arbitrary and capricious nature of the insurer. _Warner v. Liberty Mut. Fire Ins. Co._, 543 So.2d 511, 515 (La. App. 4th Cir. 1989).  An insurer acts arbitrary and capricious "when its willful refusal of a claim is not based on a good faith defense . . .  or is unreasonable or

---

[8]See Ftnt.6.

without probable cause. " *Calogero v. Safeway Ins. Co. of La.,* 753 So.2d 170, 173 (La. 1/19/00).

Where there exists a reasonable dispute as to the amount of loss, an insurer can avoid the imposition of penalties and attorney's fees by unconditionally tendering part of the claim which is undisputed. *Thibodeaux v. USAA Cas. Ins. Co.,* 647 So.2d 351 (La. App. 1st Cir. 1994).  The tender must be made, considering the facts known to the insurer at the time of the tender, in an amount over which reasonable minds could not differ. Id; see also *McDill v. Utica Mut. Ins. Co.*, 475 So.2d 1085 (La. 1985).  If there is a reasonable dispute between the insurer and the insured as to the amount of a loss, the insurer's refusal to pay is not arbitrary, capricious or without probable cause. *Molony v. USAA Property and Cas. Ins. Co.,* 708 So.2d 1220 (La. App. 4th Cir. 1998).  Whether a refusal to pay a claim is arbitrary, capricious, or without probable cause hinges on the facts known to the insurer at the time of its refusal to pay the claim. *Wells v. Houston*, 675 So.2d 474 (La.App. 3 Cir. 6/7/95).

There is no complaint that defendant did not promptly respond to the loss, considering the circumstances in the aftermath of Hurricane Katrina.  Its adjustor inspected the house on October 17, 2005.  Exhibit 7.  As a result of the October 17, 2005, inspection, defendant adjusted plaintiffs' claim based on the cost it would take to repair the damage, and made what it considered to be a reasonable tender of $6,345.22, less depreciation $1,140.39, less deductible $500.00, totaling $4,704.83, by October 21, 2005. Exhibit 7.  In computing the cost of repairs, defendant used information provided by Simsol, Inc., which is a method  commonly used in both the construction and insurance industry and has been accepted by the Louisiana Department of Insurance as a reputable starting point for both

parties in post-Katrina/Rita mediations. LAC Title 37, §4117.  By the time the inspector arrived at the mobile home, the awful conditions described by plaintiffs as existing the day of the storm would not have been so evident.  There would not have been standing water, dripping walls, sopping wet carpets.  Water damage is insidious, and its effects are not always obvious to the naked eye.  This first offer ultimately was found to be insufficient, even by defendants, but its methodology was not unreasonable under the circumstances. Plaintiffs could have used the money tendered by defendant to begin repairs on their mobile home while pursuing their remaining claims against defendant, but instead chose not to,  and for some reason did not notify defendant that they thought the  tender was unreasonable until December 23, 2005, two months after the tender was made.

Each time the plaintiff protested that the amount tendered was insufficient, the defendant responded promptly.  Throughout all of the negotiations, it is the plaintiffs who were slow to respond.  For example,  defendant did not receive the detailed estimate of repair from plaintiffs' contractor until June 7, 2006, which was months after the issue of a local contractor arose and the defendant suggested such a course of action.    After receiving the contractor's estimate, defendant immediately sent an adjustor to reinspect the loss and issued an additional check to compensate plaintiffs for their loss.[9]   The record also shows that upon notification that plaintiffs were not satisfied with this second, additional tender, defendant intended to meet with a local contractor to discuss local costs of repair and to attempt again to come to an agreement with the plaintiffs. Defendant found the plaintiff's estimate of repairs to be high, which was not an unreasonable position, and

---

[9] Although there is evidence in the record that the second insurance check was mailed, neither plaintiffs nor plaintiffs' lienholder received the check.

explained to the plaintiffs their need to have another estimate of actual repair costs from a local contractor, as well as a valuation of the mobile home.  By this time, however, almost a year had passed; the plaintiffs filed suit on the anniversary of their claim, and the negotiations ceased, according to the defendant.

Plaintiff is correct that nothing stops parties from settling a case after a lawsuit is filed, but defendant is correct in pointing out that much of the delay in adjusting the claim to the plaintiff's satisfaction lay at the plaintiffs' feet.  Defendant responded within a few weeks every time plaintiffs protested; however, plaintiffs usually took months to respond to defendant's offers.    Had defendant's offers been final offers, with no further response, the analysis would be very different, but they were not.  Nothing stopped the plaintiffs from using the checks that were issued to commence repairs and simultaneously to continue promptly to negotiate.    Thus, while defendant's responses may have been frustrating to plaintiffs, its actions did not rise to the level of being unreasonable as a matter of law.

In summary, the defendant made a timely unconditional tender to plaintiffs, and although its original tender was not sufficient to repair all of the damages sustained by plaintiffs, there is ample evidence in the record that defendant continued to readjust the loss and that it used reputable methods for valuing the damage.    It even brought in new adjustors to examine the home.  Because plaintiffs did not sustain their burden of proving that defendant breached any of the enumerated duties of good faith or fair dealing, defendant cannot be held liable for actual damages, penalties or attorneys' fees under either La. R.S. 22:658 or 22:1220.

*Damages*

Two main issues permeate the issue of damages.  The first is an issue common in every property damage case – the extent of damages.  The second concerns the role of the 2004 claim.   Defendant argues that much of the damage sustained by the plaintiffs came not from Hurricane Katrina but from the circumstances of the 2004 claim.  In other words, much of the damage either preexisted Katrina or was not caused by Katrina, but rather by leaks caused by the way the roof was shingled.

While defendant makes much of the 2004 claim, even its own records belie its argument.  Defendant performed an inspection on August 31, 2004, and did not find either a storm related opening, blown off shingles, or mold inside the plaintiffs' mobile home. Exhibit 34.  The adjustor nowhere indicates  that he found an active leak in plaintiffs' roof. Defendant instead found the mobile home in good condition and tendered $142.00 in payment of that claim.  Id.

Shortly thereafter plaintiffs called upon Leroy Young to look at the roof.  That inspection prompted another claim based on the improper installation of the shingles by the manufacturer in that they were secured by two staples in the center of each shingle rather than by four tacks on the edge of each shingle.  Once again, the defendant came out to investigate what was basically the same claim as before.  Once again the defendant did not report any damage to the roof.   Defendant instead denied plaintiffs' claim as arising from a manufacturing defect, and while defendant suggested that plaintiffs' original claim of damages must have been caused by the improperly installed shingles, defendant also reiterated that these damages were limited in nature.   Again, defendant minimized any damages regardless of causation.  Plaintiffs did not protest defendant's response, and they

repaired the roof with tar, after which they had no further problems until the arrival of Hurricane Katrina.

It is only after some three years, in October 2007, and after suit was filed, that defendant belatedly concluded that the damage sustained by plaintiffs in the aftermath of Katrina was exacerbated by an active leak attributable to improper shingle installation by the manufacturer – although an active leak was not found in the defendant's two previous reports in 2004. There is no credible explanation of how or why this conclusion was reached. Neither the defendant's photographs nor its prior adjustors' reports, prepared contemporaneously with the 2004 claim – not years later – support defendant's belated opinion. The overwhelming body of evidence presented by both defendant and plaintiffs suggests otherwise. There simply is no evidence of more than a slight leak in 2004, which was repaired by tarring the roof, and some water damage to a small portion of a facia board. While Leroy Young provided an estimate for replacing the entire roof in 2004, he explained that his estimate was a worst case scenario. He did not know whether the roof had actually sustained serious damage underneath the shingles. Possible damage is not the same as showing actual damage, or even probable damage.

Thus defendant did not establish that the damage pre-existed Katrina. Defendant, although not entirely clearly, also seems to argue that the shingles were at fault, not Katrina, for the post-Katrina condition of the mobile home. No one denies that the shingles were not installed in the best possible manner. It is hardly surprising, however, that a hurricane might lift up shingles, allowing water intrusion, whether secured by two staples

or four tacks.[10]   Defendant has pointed to nothing in the policy that required the best possible roof.  According to the plaintiffs, whose testimony the court finds credible, tarring the roof solved their bathroom leak of 2004, and they had no other leaks until the aftermath of Hurricane Katrina.  While plaintiffs would have preferred a new roof, there is no evidence that tarring the roof, while perhaps unsightly, did not resolve all problems with leaks.  There likewise is no evidence of roofing problems between 1999, when plaintiffs purchased the home, and 2004, when they complained of what they thought was a small leak around a bathroom vent.  Presumably, the singles were secured in the same fashion (two staples) from the outset.

Since defendant has the burden of proving that the damage to plaintiffs' mobile home was caused by a manufacturing defect, which would exclude payment under the policy. *Tunstall v. Stierwald*, 809 So.2d 916, 921 (La. 2/26/02), it has to do more than state conclusions.   Other than defendant's allegation of a manufacturing defect, there is no evidence in the record that the overwhelming damage to plaintiffs' mobile home was caused by anything other than Hurricane Katrina.

<u>The Value of the Damage</u>

Based on the payment methods set forth in the policy, defendant is obligated to pay plaintiffs the *lowest* of the methods of reimbursement listed in the policy.  Those payment methods provide as follows:

> The amount WE pay for loss of, or damage to YOUR mobile home, adjacent structures and personal effects except for the payment methods of Natural Disaster Protection will be the lowest of:

---

[10] The first adjustor on the scene after Hurricane Katrina found the shingles uplifted, with debris under them, and the entire mobile home had been shifted by the high winds, so that it was unlevel.

> The difference between the actual cash value of YOUR property immediately before the loss and its actual cash value immediately after the loss, or
> The cost of repairing the damage, or
> The actual cash value of YOUR property immediately preceding the loss, or
> The cost of replacing YOUR property, or
> The amount of insurance shown on Page One.
> We may also replace the property with property of similar kind, quality, and value.

Exhibit 14, p. 10.

Both plaintiffs and defendant agree that there was no evidence introduced at trial regarding the actual cash value of the property immediately after the loss or the cost of replacing the damaged property with property of similar kind, quality, and value.  Evidence was introduced at trial, however, concerning the cost of repairing the damage, the actual cash value of the property immediately preceding the loss, and the amount of insurance available.

Defendant adjusted plaintiffs' claim on a repair cost basis throughout the entirety of the negotiations.  Two primary areas of disagreement arose:  the extent of the damage and the cost of repair.  The Court finds the plaintiffs' testimony with regard to the extent of damage to be credible.  That testimony, coupled with both the plaintiffs' and defendant's photographs establishes extensive water damage and structural damage to the mobile home, and further establishes that the mobile home was in good condition prior to the storm, with no active leaks.  Even the defendant's incremental adjustment, acknowledging more and more areas of damage, supports the plaintiffs' original description of the effects of the storm.  The larger question is how to value the repair costs.

Defendant began its adjustment by using standard industry practice in the aftermath of Katrina by using the Simsol program, which automatically generates the value of certain

repairs.  Nothing dictates that the automated pricing system is the only valuation, however.

In fact, it is described as a "starting point" by the Louisiana Department of Insurance. LAC,

Title 37, §4117.  The defendant likewise indicated by its actions that more than a Simsol

estimate was going to be necessary to reach a final adjustment.  It first used just the Simsol

system, then advised the plaintiffs to have a local contractor submit an estimate, requested

a more detailed estimate, then advised the plaintiffs that it would have to obtain its own

estimate from a contractor to reach a resolution.  There is nothing inherently wrong with the

defendant's questioning Leroy Young's estimate as being on the high side.  The defendant,

however, did not have a local contractor provide an estimate, supposedly because suit had

been filed.   Defendant did not explain why the lawsuit stopped it from securing a

contractor's estimate but did not  affect its sending out another adjustor after suit had been

filed to provide yet another estimate of the cost of repairs.

Unfortunately, the only credible evidence of repair costs in the record by an actual

contractor familiar with local costs is the estimate submitted by Leroy  Young in the amount

of $71,500.00.  Exhibit 18.  Obviously, the plaintiffs stand by Young's estimate.  And

defendant's witness, the post-litigation adjustor,  testified that because defendant failed to

obtain an estimate from a local contractor,  he could not say that  Young's estimate was

*unreasonable*.[11]  Thus the court adopts Leroy Young's estimate of $71,500.00 to be the

value of repair costs for the damages sustained as the result of the storm.

Defendant further claims, however, that depreciation must be deducted from the

value of repairs.   Since the policy does not include a provision that allows for a deduction

---

[11]  Defendant's witness disputed the cause of the damage, and his valuation was through the Simsol program.

-22-

for depreciation for costs of repair, defendant  supports its decision to deduct depreciation from the insurance proceeds based on the Louisianan Department of Insurance's definition of "actual cash value" as  "the amount needed to repair or replace damaged property, minus depreciation." Louisiana Department of Insurance Bulletin 06-06, p. 3.   Defendant also relies on two cases where the courts focused on the definition of "actual cash value" only, as opposed to the definition of "cost of repair." See *Rayabco Holdings, LLC v. Markel International Ins. Co.*, 2007 WL 2265104 (E.D. La. 2007);  *Melton v. American Bankers Insurance Company of Florida*, 2007 WL 1428681 (E.D. La. 2007).  Specifically, the policy at issue in *Rayabco Holdings, LLC v. Markel International Ins. Co.*, did not provide for payment alternatives, but rather provided for payment based on "actual cash value." Although these cases address the definition of "actual cash value," they do not address the "cost of repair" and, therefore, are not applicable.  The evidence shows that defendant adjusted the loss based on "the cost of repairing the damage," which specifically references the *cost* of repair, not the *actual cash value* of the repair. See Exhibit 14.   Thus, the court finds no basis no basis for deducting depreciation from the cost of the repair tendered to plaintiffs, which leaves the cost of repair at $71, 500.00.

Whether this amount is the amount payable under the policy, however,  requires further examination.  As stated earlier, the actual benefits owed are the lowest of several items; thus if the cost of repair is higher than one of the listed items, the lower value would govern.  The primary evidence in the record, other than the cost of repairs, concerns the actual cash value of the property at various times and dates.  This evidence, however, did not add anything to the analysis: it was either not sufficiently supported or credible, or was not applicable under the terms of the policy.

Plaintiffs introduced evidence regarding the actual cash value of the property immediately preceding the loss in the form of an appraisal by Susan Giroir, a certified residential real estate appraiser with Carlin & Associates Real Estate Appraisers, Inc. Exhibit 20. Giroir conducted an appraisal of the mobile home as of August 28, 2005.[12]

She performed two different types of appraisals – a "cost-approach" and "comparative sales approach." The cost-approach resulted in a total valuation of $115,400.00 for the land and the mobile home and $77,013.00 for the mobile home, alone. The cost-approach requires the appraiser to rate the quality of the construction based on objective criteria such as the NADA Manufactured Housing Appraisal Guide or Marshall & Swift Residential Cost Handbook and to identify the source of the information. Giroir used Marshall & Swift Residential Cost Handbook in conducting the cost-approach appraisal on the mobile home, rather than the NADA Manufactured Housing Appraisal Guide. She established the value of the mobile home by multiplying the square footage of the mobile home by $43.00, but she failed to offer any support for how she determined that $43.00 per square foot was a reasonable market price for the mobile home at issue in this case.

Giroir's comparative sales appraisal, which is based on the sale of similar mobile homes in the area, resulted in a total valuation of $105,000.00, but did not include a separate valuation for the mobile home. Giroir concluded that the comparative sales appraisal was "given more consideration because typical purchasers buy based upon

---

[12] In conducting the appraisal, Ms. Giroir considered the mobile home to have "no damage, to be in liveable condition, with normal wear and tear." Exhibit 20. Giror testified that she did not know about the claim made by plaintiffs in 2004 or Young's estimate made in connection with the 2004 claim prior to performing her appraisal. Considering the minor nature of the damage found by defendant in adjusting the 2004 claim, it is doubtful that it would have greatly affected the overall outcome of Giroir's appraisal.

similar sales." Exhibit 20.  However, in order to establish the value of the mobile home, the Court would have to rely on the $77,013.00 value established through the cost-approach, or engage in speculation about the separate value of the mobile home.   Giroir's testimony simply did not establish by a preponderance of the evidence that any one particular amount was more likely than not the actual cash value of the mobile home as of August 28, 2005.

The weight to be given to expert opinion evidence lies solely within the discretion of the trial judge.  Furthermore, while the judge may not arbitrarily fail to consider such testimony, she is not obligated to accept or even credit the testimony of a particular expert. The Court, therefore, exercises its discretion and declines to accept or to credit Giroir's testimony as to the actual cash value of the mobile home immediately preceding the loss. *Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 894 (5th Cir. 1991), *citing Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977) [13]

Defendant did not offer any evidence whatsoever of the actual cash value of the property at trial; however, after trial, defendant filed an unopposed  motion to introduce two property valuations, which was granted.  Defendant offered an August 23, 2006, valuation of the property based on the NADA Manufactured Appraisal Guide dated May through August 2006, which values the property at $38,433.00 (Exhibit 11), and a December 13, 2007, valuation of the property based on the NADA Manufactured Appraisal Guide dated May through August 2007, which values the property at $50,223.67 (Exhibit 36).

The Court is not certain what purpose these two valuations were intended to serve, and the defendant provided no explanation in his motion or in his post-trial brief, other than

---

[13] Even if the Court were to rely on the $77,013.00 appraisal value as the "actual cash value of the property immediately preceding the loss," it would not be the *lowest* amount payable under the policy.

that he inadvertently forgot to include them as exhibits.  Under the policy provisions, the only valuations that matter are those existing immediately prior to and immediately after the loss.[14]  Neither of these appraisals show the value either immediately before or after the loss, as required by the insurance policy. Exhibit 14.  The defendant has the duty to investigate the insurance claim and collect information regarding the "value of the property immediately preceding [or after] the loss" to support payment pursuant to the policy terms.  See McClendon v. Economy Fire & Cas. Ins. Co., 732 So.2d 727, 732 (La.App. 3rd Cir. 4/7/99).[15]  Because neither the plaintiffs nor the defendant submitted evidence sufficient to establish the "actual cash value of the property immediately preceding the loss," payment under the policy by this method is not an option. Nor is it available for showing any valuation immediately after the loss.  There simply is no evidence proving one way or the other the actual cash value or the replacement value of the mobile home at the pertinent time periods.

Finally, the policy also provides for payment in "the amount of insurance shown on [p]age [o]ne, " should this amount be the lowest.  The amount of insurance provided by the policy on page one is $73,406.00, less the deductible. Exhibit 14. This amount would not be lower than the "cost of repairing the damage," or $71,500.00.

---

[14] These two valuations could be used in a number of ways in order to determine the "lesser value." For example, the defendant is obligated to pay only the lesser value of the actual cash value immediately before the loss, or the difference between the actual cash value before the loss and after the loss or the cost of replacing the home.  These values would not come into play in this case, of course, unless they were less than the cost of repair.

[15] Since the plaintiffs did not have the burden of proof on the cash value, their submission was more in the nature of a preemptive strike in anticipation of defendant's attempt to submit a lower value.

Considering the methods of payments listed in the policy of insurance, the lowest amount payable for the claim is the "cost of repairing the damage."  Thus, plaintiffs are entitled to $71,500.00 as the cost to repair the damage to their mobile home, less the $500.00 deductible.

### Conclusion

For the foregoing reasons, the Court will enter judgment for the plaintiffs and against the defendant, ordering that the defendant pay plaintiffs the cost of repairing their mobile home in the amount of $71,500.00, less their deductible in the amount of $500.00, plus judicial interest from the date of demand.  The parties shall submit an agreed form of judgment by **June 9, 2008.**

Signed in Baton Rouge, Louisiana, on May 30, 2008.

**MAGISTRATE JUDGE DOCIA L. DALBY**